**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| LAKE FOREST REAL ESTATE INVESTORS, LLC, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 19 CV 2263 |
| VILLAGE OF LINCOLNWOOD, ILLINOIS, ET AL., | ) ) ) | Honorable Judge Charles P. Kocoras |
| Defendants. | ) | |

**DEFENDANTS VILLAGE OF LINCOLNWOOD AND BARRY BASS'
MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
ON PLAINTIFF'S COUNT II CLASS-OF-ONE EQUAL PROTECTION CLAIM**

**FACTUAL OVERVIEW**

What came to be called the Purple Hotel had quite a history before it closed its doors and lapsed into bankruptcy. DSOF 1. For the corporate authorities of the Village of Lincolnwood, the Purple Hotel represented a history of false starts, frustrations and failures.

For several years, the Village worked with a development firm called North Capital Group (NCG) which had charted a course to redevelop the Purple Hotel after it bought the property out of bankruptcy. Over those several years of work with NCG, what developed was – nothing. While it held the property for several years and entered into a Redevelopment Agreement with the Village, NCG was unable to deliver the hoped-for development. DSOF 3. NCG's lender, Romspen, foreclosed on NCG, and ultimately took back title to the property in 2017. DSOF 3.

The development of the Purple Hotel was a priority goal for the political leaders of Lincolnwood. DSOF 6. Defendant Barry Bass ran for Village President in April 2017 on the platform to get Purple Hotel developed. DSOF 6. In spring-summer of 2017, the Village laid the groundwork so the Village could acquire the Purple Hotel property using its home rule authority

as well as its authority under the Tax Increment Financing Act, 65 ILCS 5/11-74.1-1 *et seq.* The Village commissioned the Lakota Group, a planning consultant, to prepare a comprehensive plan for the development of the property. DSOF 7. On August 15, 2017, the Village Board adopted a resolution approving the Lakota Plan and setting forth the prospect that the Village itself would acquire the property by way of the exercise of the Village's power of eminent domain. DSOF 8.

While this was going on, a number of private developers were seeking to acquire the property and met with the Village on a preliminary basis. DSOF 9. One of these would-be developers was a newly formed entity called Lake Forest Real Estate Investors (LFRE) and its principal, Michael Sieman. Mr. Sieman's expertise was finance, putting together financial packages among investors and lenders for development projects. DSOF 10-11. Sieman and an architect named Todd Zima formed an affiliated firm which called itself Z/S, to do the actual development of the Subject Property. DSOF 11. Like Mr. Sieman, Mr. Zima had no experience as a developer; his strong suit was architecture. DSOF 12.

On December 1, 2017, Romspen and LFRE entered into a contract for LFRE's acquisition of the property. The purchase price was $10,700,000.00; a $300,000.00 earnest money deposit became non-refundable as of February 14, 2018; and the full purchase price needed to be paid by April 2, 2018. DSOF 13-14.

Given LFRE's lack of development experience, the news of its purchase contract was greeted with considerable concern and skepticism by both the Village Board of Trustees and members of the Village's advisory Economic Development Commission. DSOF 17. As summarized by Village Manager Tim Wiberg, the Village Board did not want to "go down another rabbit hole" with a potential developer who did not appear to Village authorities to have the experience to bring off a development of this size and scope. DSOF 17.

During December 2017 and January 2018, LFRE initiated no contact with the Village. Its efforts were focused on obtaining investors and acquiring additional property adjacent to Purple Hotel. While they were interviewing planners, Z/S had not settled on a planner they would retain to actually work on developing a specific project. DSOF 15, 24.

In February 2018, Sieman and Zima responded to Wiberg's request for a staff level meeting, and one was scheduled for February 20, 2018. DSOF 20. In the meantime, the Village Board was charting another course of action during closed session meetings in February, 2018.[1] DSOF 19, 21-22. During the course of its February 6 and February 13 executive sessions, the Village Board determined to pursue a course which included initiating the process to either purchase the property from Romspen or acquire it judicially through the exercise of eminent domain. DSOF 21. In light of this contemplated course of action, the Village Board directed Wiberg to cancel the staff-level meeting with Sieman and Zima. DSOF 22.

The Village Board initially considered a preliminary acquisition ordinance at its February 20, 2018 meeting. Mr. Sieman appeared at the Board meeting and argued against adoption. DSOF 25-26. The Village Board agreed to defer action on the ordinance until its next meeting on March 6, 2018. DSOF 26. The ordinance was ultimately adopted on March 6, 2018, following an executive session feasibility presentation by the Village Finance Director. DSOF 28.

In response to a demand from Romspen's lawyer, the Village Board and EDC conducted a joint meeting on March 20, 2018, at which time Mr. Zima and Mr. Sieman made a complete presentation to the Village Board. DSOF 29-30. No action was taken on the matter at the March 20 meeting. DSOF 30.

---

[1] The Illinois Open Meetings Act allows municipalities to meet in closed or executive session to consider, *inter alia*, pending or potential litigation and property acquisition.

The next Board meeting was on April 3, 2018. DSOF 35. But a great deal occurred between the March 20, 2018 meeting and the April 3, 2018 meeting. First, LFRE tried to sell its contract to purchase the property by reaching out to Richard Tucker to see if Tucker Development would have an interest in acquiring the contract by way of purchase or some sort of venture with LFRE. DSOF 33.

But Tucker had different ideas. He engaged in direct negotiations with Wesley Roitman of Romspen in order for Tucker to buy the property. DSOF 32-33. Tucker also advised the Village that his company may have an interest in acquiring the property. DSOF 33.

Mr. Sieman and his lawyer appeared at the Village Board's next meeting on April 3, 2018. After admitting that neither he nor Zima was a developer, and even though his contract was expiring the next day (having been extended by Romspen for two days), Sieman asked that the staff level meeting be rescheduled. DSOF 35. The Village agreed. Village staff contacted Sieman the next day to arrange a meeting. DSOF 38. Sieman cancelled that meeting a few days later. DSOF 41.

At this point (a) Romspen terminated its contract with LFRE based on failure to close; (b) Tucker Development obtained its own contract to purchase the property from Romspen; (c) Tucker identified itself as the new contract purchaser; and (d) at the request of Tucker, the Village Board discontinued its effort to acquire the property and negotiated a new development deal with Tucker. DSOF 40, 42.

**REMAINING CLAIM**

What remains of this lawsuit following motion practice is Plaintiff's Count II class-of-one equal protection claim. The sole class-of-one comparator is Tucker Development, the same entity Plaintiff invited to the development dance. See, *e.g.* Doc. # 41, ¶ 77 ("LFRE and Tucker, the

4

ultimate purchaser of the property, are similarly situated in that they are both experienced, qualified purchasers and developers. They are *prima facie* identical in all relevant respects").

For purpose of Plaintiff's claim, the first issue is whether Tucker and Plaintiff are similarly situated real estate developers within the meaning of class-of-one jurisprudence. Assuming the requisite similarity is shown, the second issue is: What was the differential treatment between Plaintiff and Tucker and why? Put another way: (1) Given the history of Purple Hotel, could a reasonable Village Board have concluded that rather than proceeding down an uncertain development path with an inexperienced and unknown would-be developer, it made more sense for the Village to buy the property so the Village could control its future as an owner rather than as a mere regulator? And then, (2) could that same Village Board have reasonably concluded that once an experienced developer with a proven track record acquired a contract to purchase the property, it now made more sense for the Village to step back from its acquisition efforts in favor of working with this developer and negotiating a development deal?

## GENERAL SUMMARY JUDGMENT STANDARD

This Court has recently set forth the summary judgment standard in *McHugh v. Illinois Department of Transportation*, 2021 U.S. Dist. LEXIS 182057 (N.D. Ill. 2021) at * 13-14:

> *Summary judgment* is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)* (cleaned up). "A genuine dispute as to any material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Kvapil v. Chippewa Cnty., 752 F.3d 708, 712 (7th Cir. 2014)* (cleaned up). In deciding whether a dispute exists, the Court must "construe all facts and reasonable inferences in the light most favorable to the nonmoving party." *Citizens for Appropriate Rural Roads v. Foxx, 815 F.3d 1068, 1074 (7th Cir. 2016)*. The nonmovant "must go beyond the pleadings" to demonstrate that there is evidence "upon which a jury could properly proceed to find a verdict in [their] favor." *Modrowski v. Pigatto, 712 F.3d 1166, 1168-69 (7th Cir. 2013)*. "The existence of a mere scintilla of evidence, however, is insufficient

to fulfill this requirement." *Wheeler v. Lawson, 539 F.3d 629, 634 (7th Cir. 2008).* And "[c]onclusory statements, not grounded in specific facts" cannot defeat a motion for summary judgment. *Bordelon v. Bd. of Educ. of the City of Chi., 811 F.3d 984, 989 (7th Cir. 2016)* (cleaned up).

## PLAINTIFF'S SPECIAL CLASS-OF-ONE BURDEN AT SUMMARY JUDGMENT STAGE

There is an important summary judgment wrinkle in class-of-one cases. As recently explained by the Court of Appeals in *FKFJ, Inc. v. Village of Worth*, ___ F.4th ____, 2021 WL 3782732, 2021 U.S. App. LEXIS 25759 (7th Cir. 2021): "Class-of-one claimants carry a heavy burden. To support its class-of-one claim, FKFJ must show that it was intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Id.* at * 23 [internal citations omitted].

"To satisfy the 'similarly-situated' element, FKFJ and its comparators must be '*prima facie* identical in all relevant respects or directly comparable . . . in all material respects." *Id.* [internal citations omitted]. Under "the rational basis standard, a class-of-one Plaintiff must, to prevail, negative any reasonably conceivable state of facts that could provide a rational basis for the classification." *Id.* [internal citations omitted]. *FKFJ* notes that there is uncertainty in the Circuit as to whether a Plaintiff must also prove that the government acted with an illegitimate animus. *Id.*

As to the similarly-situated prong, the Seventh Circuit has "required class-of-one claimants to strictly comply with presenting evidence of a similarly-situated entity at the summary judgment stage." *Id.* "To be similarly situated, comparators 'must be identical or directly comparable' in all material respects." *Chicago Studio Rental, Inc. v. Illinois DOC*, 940 F.3d 971, 980 (7th Cir. 2019) citing, *inter alia, Miller v. City of Monona*, 784 F.3d 1113, 1120 (7th Cir. 2015). See also, *LaBella* at 942 ("What is 'clear is that similarly-situated individuals must be very similar indeed'"),

6

citing *McDonald v. Village of Winnetka*, 371 F.3d 992, 1002 (7th Cir. 2004).

As to the second, "rational basis" prong, a Court asks "whether a *conceivable* rational basis for the difference in treatment exists. In fact, the rational basis need not even be the actual justification. Any reasonably conceivable state of facts that could provide a rational basis will suffice." *145 Fisk, LLC v. Nicklas*, 986 F.3d 759, 771 (7th Cir. 2021) cert. denied 2021 U.S. LEXIS 2934 (June 7, 2021) [internal citations omitted]. The "conceivable rational basis" test in the context of this case is a question of law for the Court. See *e.g., Muscarello v. Ogle County Board of Commissioners*, 610 F.3d 416, 423 (7th Cir. 2010) (Issues dealing with the "deferential rational basis test" raise "a pure question of law").

**ARGUMENT**

**A.  As a Matter of Law the Class-of-One Theory Is Inapplicable To the Decisions of the Corporate Authorities At Issue in This Case**

In the course of ruling on Defendants' motion to dismiss, the Court rejected the defense argument based on case authority from other circuits that the class-of-one equal protection theory is inapplicable to the land use decisions at issue in this case, which by their very nature are highly subjective. 2019 WL 5694311 at nt. 2 ("However, the Seventh Circuit has not extended *Engquist* [*v. Oregon Dept. of Agriculture*, 553 U.S. 591 (2008)] to the zoning context, and the Court declines to do so here absent their guidance"). It appears that the Seventh Circuit has still not squarely addressed this issue. Accordingly, solely for purposes of preserving our record on this issue, Defendants reassert this position. It remains a matter of considerable discussion in various courts. See most recently, the observations of the dissent in *Andrews v. City of Mentor*, 2021 U.S. App. LEXIS 25609 (6th Cir. 2021), at 42-43 ("'Local land use decisions are of a quintessential example of subjective and individualized action by decisionmakers vested with the discretion needed to balance competing interests'") [Internal cite omitted].

7

## B. The Village Board Never Denied Plaintiff the Opportunity for a Pre-Application PUD Conference Because Plaintiff Never Prepared the Required Development Plan.

Before moving into the class-of-one analysis, it is important to point out that the major factual predicate for Plaintiff's claim of differential treatment is a fatally flawed red herring. Amended Complaint paragraphs 70 *et seq.* allege that the Village corporate authorities stonewalled Plaintiff's efforts to obtain a "pre-application conference" with the Village Board in accordance with Section 8.05(1) of the Village zoning ordinance, said conference "accompanied by the required material set forth in Section 8.06(1)." Amended Complaint paragraph 70 alleges that the action of the Defendants precluded Plaintiff from "accessing the procedures that Village ordinance provided as a matter of right as set forth in Village Code Zoning Chapter 15, Article VIII, §§ 805, 806."

As set forth DSOF 54 - 57, a party proposing a planned unit development (PUD) have a plan. The purpose of the pre-application conference is to discuss the proposed development with the Village Board. Section 8.06(1) sets forth the written submission requirements – one of which is a "written description of the proposed planned unit development, describing the purpose of the development, and the proposed land uses." DSOF 55.

Discovery – in particular, the deposition of Mr. Zima and the transcript of the March 20, 2018 combined Board-EDC meeting – has revealed that Plaintiff had no ability to make a preliminary PUD presentation to the Village Board. Plaintiff was months away from being in a position to submit for a pre-application conference with the corporate authorities, because as of the date its contract was terminated, <u>Z/S had no plan.</u>

The Z/S "plan" was to have a series of conceptual meetings with various "stakeholder" groups, and then develop a plan. See Zima Dep. 38-39 ("And we knew these meetings needed to play out over the next month or two in the spring while our design consultants were [getting] up to speed and at those meetings because the way we wanted to develop the project was taking all that in and then creating a vision . . . and make sure that it fit within the financing model"). Zima further admitted that he and Mr. Sieman were attempting to set up a staff-level meeting to establish "a very formal plan to do that and then present our design at the end of that process to the Village formally and move into permanent documents." DSOF 57; Zima Dep. 39, 43.

At the March 20, 2018 combined meeting, Village Trustee Cope observed that "I think it's impossible for us to make an evaluation about your development because there is no development." **Def. Ex. 56 at 84.** Zima acknowledged that as of that date, Plaintiff had not even retained a planner. **Def. Ex. 56 at 89.** Manager Wiberg [identified in the transcript as "unidentified male speaker"] interjected that "What Trustee Cope is asking though, when would you just think you would have this plan ready to come to the Village to share? This is what we'd like to build, so we'd like to go to the Economic Development Commission to discuss a potential incentive." **Def. Ex. 56 at 89.**

Contrary to Plaintiff's assertion of a Village stonewalling, Plaintiff was never in a position to submit to the PUD process because it never developed a plan. Plaintiff never even hired a planner. In simplest terms, one cannot appear before the Village Board at a pre-application conference regarding a proposed PUD if the applicant has no "P."

Therefore, the factual predicate of Plaintiff's claimed discriminatory treatment is without merit. The undisputed record now shows that the meeting which was cancelled was a very preliminary staff level meeting to begin discussing the project and establishing what Mr. Zima

9

referred to as a "roadmap" preceding having a "formal plan in place."

### C. Plaintiff and Tucker Development Are Not Similarly Situated Developers For Class-of-One Purposes.

For purposes of the similarly-situated element, Plaintiff really consists of two newly-formed entities. LFRE and Z/S Development. For purposes of our analysis, both entities are referred to simply as "Plaintiff," as Michael Sieman is the moving force behind both entities.

No reasonable factfinder could conclude that Plaintiff and Tucker are *prima facie* identical in all relevant respects, or directly comparable in all material respects. Tucker Development is a vertically integrated real estate developer with over 20 years' experience. Tucker has an impressive resume of successful mixed-use developments, both in the Chicago metropolitan area and elsewhere in the country. Tucker is a successful, experienced "soup-to-nuts" developer with the ability to successfully take on a project like the redevelopment of Purple Hotel.[2]

In sharp contrast, Plaintiff had zero experience as a developer. Sieman's experience and sophistication are in the financing of real estate projects, which means that he helps developers borrow money and helps investors make money from those loans.

But a person who arranges financing for real estate developers is not a real estate developer. Experienced developers do so much more. They find properties, assess what can be done by way of improvements, go through the entitlement process, borrow money, deal with prospective tenants, bid out the job, cope with contractors and subcontractors, wrestle with unions. The list goes on.

Plaintiff has admitted that the Purple Hotel was Mr. Sieman's first foray into the world of real estate development as a developer. Mr. Zima likewise had no development experience. He

---

[2] "From soup-to-nuts" is an idiom meaning from beginning to end. The phrase originates "from the full course dinner served during the 1800s which typically started with a soup course and ended with port served with nuts." See *Grammarist.com/idiom/from-soup-to-nuts*.

was an architect employed by a large firm before he went on his own and decided to partner with Mr. Sieman in 2017.

If this comparison were not enough, Mr. Sieman's April 3 smoking gun admission should end the inquiry. Contrary to Plaintiff's pleading and discovery response assertions, Mr. Sieman candidly admitted that neither he nor Mr. Zima was a real estate developer.

Plaintiff has failed to satisfy its summary judgment burden of coming forward with evidence satisfying the similarly-situated prong of the class-of-one test. Based on that failure, Defendants are entitled to summary judgment. If the Court agrees on this point, then there is no need to address the rational basis element. *Monarch Beverage Co., Inc. v. Cook*, 861 F.3d 678, 682 (7th Cir. 2007) (In class-of-one litigation, "if the Plaintiff can't identify a similarly-situated person or group for comparison purposes, it's normally unnecessary to take the analysis any further; the claim simply fails"); *Paramount Media Group, Inc. v. Village of Bellwood*, 929 F.3d 914, 920 (7th Cir. 2019).

As in *Paramount*, "at least one major difference separates" Plaintiff and Tucker. Tucker is a highly experienced developer and Plaintiff had no development experience. "No reasonable jury could . . . conclude that the two companies were similarly situated. No further analysis is needed." 929 F.3d at 920.

D. **The Record Contains Ample Rational Bases For The Actions of The Corporate Authorities.**

Defendants are entitled to summary judgment on the rational basis element because the record reveals a "reasonably conceivable state of facts that could provide a rational basis" for the decisionmaking of the Village Board during the months of February – April, 2018. *Scherr v. City of Chicago*, 757 F.3d 593, 958 (7th Cir. 2014) [emphasis and citation omitted]. The Seventh Circuit's decision in *145 Fisk, LLC v. Nicklas*, 986 F.3d 759 (2021) is on point. In *Fisk*, the City

of DeKalb "entered into a preliminary agreement" with Plaintiff for the redevelopment of a blighted area. *Id.* at 762. Some time later, a new Village manager came on board, raised questions regarding the developer's lack of 'the financial capacity or the experience' necessary for the project," *Id.* at 763, and the City ultimately terminated the development relationship. *Id.* at 765.

The Court upheld the dismissal of the complaint. As to the class-of-one claim, after summarizing the applicable principles, the Court proceeded to the rational basis prong. "The rational-basis requirement sets the legal bar low," citing *D.B. v. Kopp*, 725 F.3d 681, 686 (7th Cir. 2013). The City Manager's "concerns about the use of millions of dollars in taxpayer funds easily clear that bar." *Id.* at 772. One of the other reasons offered by the City Manager for terminating the development agreement was that Plaintiff's "entity lacked hotel experience." *Id.* at 772. "Fisk has not claimed that Fisk or its principals were not inexperienced. Therefore, Fisk has not negated [the City Manager's] claim that it was inexperienced as a 'conceivable' rational basis either."

This case is even more compelling that *Fisk* because there is a developed record. The undisputed record shows ample grounds upon which a reasonable municipal governing body could conclude that given the importance of Touhy and Lincoln and the history of Purple Hotel redevelopment failures, it made more sense for the Village to bite the bullet and use its statutory authority to buy the property and control development as an owner, rather than to risk another drawn-out failure with a would-be developer who had no development experience.

Furthermore, a rational municipal governing body could have concluded that once a vertically integrated, experienced developer became the contract purchaser, it now made more sense for the Village Board to pause and work with that proven commodity rather than going through the process of eminent domain, with all the time and effort that might entail.

This case is unique, because the two class-of-one elements merge. The rational basis for the Village decisionmaking (Element 2) is precisely because Plaintiff and Tucker are not similarly situated real estate developers (Element 1). Whether the Court considers only the first element, the second element, or these two elements blended together, all roads lead to the same conclusion – Tucker and LFRE are worlds apart, and the challenged decisionmaking was rational, and Defendants are entitled to summary judgment on the class-of-one claim.

### E. Defendant Bass Was Not Individually Responsible For Any of The Decisions At Issue In This Case. In The Alternative, He Is Entitled To Judgment Based On Absolute Legislative Immunity or Qualified Immunity.

Should the Court grant this motion on the class-of-one issue, there is no need to address claims against Bass. For purposes of completing the defense argument, Bass asserts that he is entitled to summary judgment because all of the decisions at issue in this case were collective decisions made by the corporate authorities of the Village.

As a factual matter, the only underlying decisions or actions taken by the Board of Trustees were to consider, then adopt the acquisition ordinance; and to direct Village Manager Wiberg to cancel the February 20, 2018 preliminary staff meeting. These were collective decisions taken by the Board of Trustees as the Village's legislative body. Bass was never called on to vote on any of these measures. While Bass is a member of that legislative body by virtue of his position as Village President, his role in the actions taken by the Board are very limited. The Mayor only votes in the case of a tie. 65 ILCS 5/3.1-1 40-30.

Beyond that, Bass is entitled to either absolute or qualified immunity. Because all of the decisions at issue in this case were made within the sphere of legislative activity, Bass is entitled to absolute immunity. See *Bogan v. Scott-Harris*, 523 U.S. 44, 54 (1998); *Biblia Abierta v. Banks*,

129 F.3rd 899, 905 (7th Cir. 1997) ["We believe that rezoning (including participation in the introduction and passage of a rezoning ordinance) is a legitimate legislative activity"].

Finally, whatever actions Plaintiff ascribes to Bass are unsupported by the evidence. To the extent there were any evidentiary support, none of the actions of Bass violated any clearly established principles of constitutional law of which a reasonable elected official would have been aware. Accordingly, Bass is entitled to summary judgment based on his qualified immunity. *Allen v. City of Chicago*, 2019 WL 3003025 (N.D. Ill. 2019) at * 15 (setting forth general principles).

## CONCLUSION

For all of the above reasons, Defendants are entitled to summary judgment.

Respectfully submitted,

VILLAGE OF LINCOLNWOOD, et al.

By: /s/ John B. Murphey
     John B. Murphey, Their Attorney

John B. Murphey
Odelson, Sterk, Murphey, Frazier & McGrath, Ltd.
3318 West 95th Street
Evergreen Park, Illinois 60805
Tel: 708-424-5678/Fax: 708-741-5053
jmurphey@osmfm.com

Hart M. Passman
Steven M. Elrod
Elrod Friedman LLP
325 N. LaSalle Street, Suite 450
Chicago, Illinois 60654
hart.passman@elrodfriedman.com
steven.elrod@elrodfriedman.com

**CERTIFICATE OF SERVICE**

   I hereby certify that on October 18, 2021, I electronically filed the foregoing documents with the Clerk of the Court using the CM/ECF system which will send notification of said filing to all parties listed below:

Mark Silverman
Melanie J. Chico
Molly E. Thompson
Dykema Gossett PLLC
10 S. Wacker Drive, Suite 2300
Chicago, Illinois 60606
msilverman@dykema.com
mchico@dykema.com
mthompson@dykema.com

            By: /s/ John B. Murphey
               John B. Murphey