# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| LAKE FOREST REAL ESTATE INVESTORS, LLC, an Illinois Limited Liability Company,<br><br>      Plaintiff,<br><br> vs.<br><br>THE VILLAGE OF LINCOLNWOOD, ILLINOIS, an Illinois Municipal Corporation, and BARRY I. BASS, individually and as President of the Village of Lincolnwood,<br><br>      Defendants. | Case No. 19CV02263<br><br>Judge Charles P. Kocoras |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff, Lake Forest Real Estate, LLC ("LFRE" or "Plaintiff"), for its Memorandum of Law in Opposition to the Motion for Summary Judgment filed by Defendants Village of Lincolnwood ("Village") and Barry Bass ("Bass") (collectively, "Defendants"), states as follows:

## I. INTRODUCTION

Defendants' theory of the case rests on a single flawed premise—that their admittedly disparate treatment of Plaintiff and the subsequent contract purchaser, Tucker Development ("Tucker"), was justified because Defendants questioned Plaintiff's ability to complete the project. Plaintiff and Tucker were similarly situated in that they were both contract purchasers for the Purple Hotel at the time they sought to access the zoning application process. Bass and other Village officials admitted that the Village cannot dictate who buys private property and the Code does not set any preconditions or qualifications for a developer to be allowed to access the zoning process. Plaintiff's alleged lack of credentials or experience, which is contradicted by the record, therefore cannot provide a basis for the Village to refuse to engage in the legally-required process

with LFRE. Defendants complain after-the-fact that they did not have enough information regarding LFRE's plans and credentials, but it was the Defendants who refused to meet with LFRE despite repeated requests from LFRE for meetings, ignored the information that LFRE provided, and later allowed Tucker to proceed with a far less developed plan than LFRE's.

Discovery has shown that Bass went outside the normal Village process to ensure that LFRE lost the project and Bass's preferred developer took over. He succeeded. It is also clear that the Village enacted the Condemnation Ordinance and Code Enforcement Resolution to inflict pain on LFRE and force them out. Again, they succeeded. This conduct undoubtedly establishes a class-of-one equal protection violation. At a minimum, multiple genuine issues of material fact exist with regard to Plaintiff's claim, and summary judgment is improper.

## II. SUMMARY OF FACTS

LFRE was the contract purchaser with Romspen, and ZS Development ("ZS") was the proposed developer of the Purple Hotel property. PSOF 1. ZS was a joint venture between Michael Sieman and Todd Zima, who had each previously participated in multiple complex mixed use developments similar to the proposed project. PSOF 1-4.

In 2016, before Romspen took title from prior owner North Capital Group, LFRE requested information, met with Village officials, and shared its concepts regarding the site. PSOF 5, 6. In November 2016, LFRE met with Village staff to show the first iteration of new design ideas and commissioned architectural designs. PSOF 6. On January 11, 2017, LFRE sent site and floor plans and an area summary to the Village. PSOF 6.

Bass was sworn in as President on May 2, 2017, and the Village met with LFRE on June 7, 2017, at which time LFRE presented 3D models of its plans. PSOF 8. During the June 7 meeting, "**Lincolnwood staff . . . noted that a number of workshops would be necessary before various**

**Village boards before a preapplication presentation could be made**." PSOF 8 (emphasis added). The Village also told LFRE that it was interested in having LFRE assemble two properties to the north of the site. PSOF 8. On August 15, 2017, the Village approved a concept plan called the Lakota Plan that was similar to LFRE's and included assemblage. PSOF 9.

LFRE signed a Letter of Intent with Romspen to purchase the property on November 1, 2017 and entered the Purchase and Sale Agreement ("Purchase Agreement") on November 30, 2017. PSOF 11, 13. Despite Bass's knowledge of the foregoing, Bass met with Romspen without LFRE present and questioned why Romspen had not responded to Marvin Feiger's offer (PSOF 12); Bass also asked Village staff to secretly send site information to his brother-in-law Phil Goldberg (PSOF 14). Goldberg then met with Sieman to view LFRE's 3D plans and asked to participate in the project—a request Sieman denied. PSOF 19.

On December 14, 2017, LFRE met with the Village and explained they were in the middle of due diligence and still trying to assemble the northern parcels. PSOF 15. At the end of the meeting, LFRE told the Village they would get back to them in early February and continued to stay in contact. PSOF 15, 18; Resp. to DSOF 15. On January 25, 2018, LFRE determined that assemblage was not feasible. PSOF 19. Village Manager Tim Wiberg confirmed a staff level meeting with LFRE for the morning of February 20, 2018 to outline the "staff's proposed schedule for getting your project through a staff review process, as well as the PUD process involving the Plan Commission and Village Board." PSOF 20; Resp. to DSOF 20. On February 13, 2018, with the impression that the February 20, 2018 meeting was still proceeding, LFRE elected to "go hard" with its $300,000 deposit. PSOF 20.

On February 14, 2018, Bass directed Wiberg to cancel the February 20 meeting and not to schedule any more meetings with LFRE. PSOF 21; Resp. to DSOF 22. On February 16, 2018,

3

LFRE learned through the Village's agenda for the February 20 Board meeting[1] that the Village was initiating the eminent domain process. PSOF 22; Resp. to DSOF 22. The Village also began enforcing Code violations that had existed unenforced for years, including a demand for removal of the site's foundations. PSOF 23. Sieman appeared at the February 20 and March 6 Board meetings to explain LFRE's plans, request that the staff meeting be rescheduled, and urge the Village to postpone the Condemnation Ordinance and work with him to remediate the site. PSOF 24, 26, 28. His requests were denied. PSOF 24, 28.

At the March 20 COTW meeting, LFRE presented 3D images of its site plan but was treated "with hostility" by the Village. PSOF 31. Sieman and Zima explained their vision for the development process and associated partnerships, proposed mixed uses, financing and capitalization strategy, and compared their plan with North Capital Group's plan and the Lakota Plan. PSOF 31. Sieman sent an email on March 22, 2018 asking the Village for guidance as to exactly what they wanted in a developer. PSOF 32. Wiberg doubted that the Village ever responded because "it wasn't a gag order but it was, you know, it was a very carefully orchestrated process at that point" and "we were told not to meet with them anymore and do – be very careful in our communications with them; and as I told you a couple times in this process and today, I was always uneasy about the way we were handling that. It was not typical." PSOF 32. LFRE intended to present at the March 28, 2018 EDC meeting, but that meeting was canceled. PSOF 33. LFRE requested to be put on the COTW agenda for April 3, 2018, but the Village did not respond and,

---

[1] Staff-level meetings involve mostly officials, like the Village Manager, who are not elected and address specific Village concerns. Board meetings involve elected officials, including the mayor and trustees, and are generally open to the public. A closed session is a board meeting that is not open to the public. The Economic Development Committee ("EDC") is an advisory committee designed to facilitate economic growth in Lincolnwood.

4

when Sieman appeared at the meeting, he was given limited time to speak; certain Trustees explained they had requested that Bass put Sieman on the agenda. PSOF 33.

Given the stonewalling by the Village and the difficulties created by the Condemnation Ordinance and Code Enforcement Resolution, LFRE attempted to mitigate its damages by assigning the contract to Tucker. Resp. to DSOF 33, 35. Romspen issued a contract termination notice after the April 4, 2018 closing date, after which Tucker entered into its own purchase contract with Romspen. PSOF 34, 36.

In glaring contrast to LFRE's treatment, the Village permitted Tucker to present at the Village COTW meeting on April 17, 2018—three days after becoming the contract purchaser. PSOF 36. Two weeks later, the Village approved a resolution to repeal the Condemnation Ordinance and stay the code enforcement, and then the Village rescinded the Condemnation Ordinance. PSOF 37, 38. All of this happened before Tucker had shown the Village any plans. PSOF 36, 37. Tucker did not offer information to the Village on financing until Summer 2018, in contrast with LFRE who had two loan applications for construction and permit financing ready to be executed as well as joint venture partners that would be able to qualify for financing. PSOF 36. Yet, the Village agreed to help Tucker get through the process "as quickly as we could." PSOF 39.

As of the close of discovery, more than three years after Tucker became contract purchaser, Tucker still had not broken ground. PSOF 40. He had not provided a firm date for breaking ground to the Village, nor had the Village requested one. PSOF 40. Tucker's only on-site work consisted of erecting a fence with signage. PSOF 40. When LFRE proposed the same steps to the Village, the Village would only accept removal of the foundations separate from the construction at the cost of $1 million. PSOF 40.

III.   **LEGAL STANDARD**

5

Summary judgment is appropriate only when the materials in the record show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "The initial burden is on the moving party . . . to demonstrate that there is no material question of fact with respect to an essential element of the non-moving party's case." *Cody v. Harris*, 409 F.3d 853, 860 (7th Cir. 2005). The court must construe all facts and inferences in favor of the non-moving party, *Delta Consulting Grp., Inc. v. R. Randle Const., Inc.*, 554 F.3d 1133, 1137 (7th Cir. 2009), and credibility determinations must be left to the jury, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## IV. ARGUMENT

### A. Plaintiff's Class-of-One Claim Applies to Defendants' Conduct.

Defendants' attempt to dramatically expand the reach of *Engquist* in order to excuse the Defendants' unjustifiable conduct must once again be rejected.[2] The Supreme Court's holding in *Engquist* is narrow: "all we decide" is that the "class-of-one theory of equal protection has no application in the public *employment* context." *Engquist v. Or. Dep't. of Agric.*, 553 U.S. 591, 607 (2008) (emphasis added). The Court's analysis was premised on the distinction between the significant leeway given to the government when dealing with its own employees versus the standard it is held to when dealing with other citizens, like LFRE. *Id.* at 599. *Andrews* also does not support Defendants' position. The request for rezoning at issue in that case was a highly-subjective land-use decision, not a refusal to engage in a legally-required process. *Andrews v. City of Mentor*, 11 F.4th 462, 482 (6th Cir. 2021) (Larsen J., dissenting). Moreover, the Sixth Circuit's majority allowed plaintiff's equal protection class-of-one claim to proceed. *Id.* at 478.

---

[2] This Court previously rejected Defendants' blanket proposition that a class-of-one equal protection claim could not apply under the circumstances of this case. Dkt. 39 at 14, n.2.

6

B. **Defendants Refused to Schedule Workshops/Meetings Defendants Themselves Required for Plaintiff's Pre-Application Submission.**

Defendants' assertion that Plaintiff "had no plan" is belied by the record and ignores the very process the Village instructed LFRE to follow and then obstructed. Dkt. 96 at 8; *see* PSOF 5, 6, 24, 31. The Village told LFRE that various meetings and approvals would be needed before a pre-application conference could take place, and subsequently refused to conduct the very meetings it required. PSOF 8, 20, 21, 30. Once LFRE was under contract to buy the land, Defendants did not just move the proverbial goalposts for the pre-application conference—they never even let LFRE onto the field.

When Village officials (including Bass) met with LFRE on June 7, 2017, LFRE presented 3D models of its plans. PSOF 8. Defendants "noted that a number of workshops would be necessary before various Village boards before a preapplication presentation could be made" and told LFRE that the Village wanted LFRE to assemble two neighboring properties. PSOF 8. LFRE met with the Village on December 14, 2017—two weeks after entering into the Purchase Agreement. PSOF 15. Zima and Sieman explained they were in due diligence and updated the Village on their efforts to assemble. PSOF 15. The Village again encouraged those efforts. PSOF 15. LFRE told the Village they would follow up in February 2018. PSOF 15. On January 25, 2018, LFRE made the final determination that assemblage was not feasible[3] and decided to move forward with planning the project site. PSOF 19.

Consistent with these prior discussions and the Village's instructions, LFRE attempted to coordinate a staff level meeting with the Village in February 2018 to discuss the pre-application plan. PSOF 20. On February 12, 2018, Wiberg confirmed a February 20 staff meeting with LFRE,

---

[3] Tucker was also unable to assemble the neighboring properties. PSOF 19.

7

at which the parties would outline the schedule and the next steps that the Village would require. PSOF 20. Village Planning and Zoning Director Steve McNellis acknowledged that he did not email Plaintiff at any point to explain the next steps or a projected timeline, as he did for Tucker within a month after Tucker signed its purchase agreement. PSOF 30, 39.

On February 14, 2018, the day Bass knew that LFRE's $300,000 deposit became non-refundable, Bass ordered Wiberg to cancel the February 20 meeting and to not schedule any meetings with LFRE. PSOF 21. As Wiberg testified, he "always had that uneasy feeling that things were occurring that I wasn't aware of or it was not typical to act this way . . . it always bothered me that we had to treat these guys the way we did but that's the way it went." PSOF 21. Despite the Village holding closed executive sessions on February 6 and February 13 regarding moving forward with the Condemnation Ordinance, Bass delayed in directing Wiberg to cancel the meeting until February 14. PSOF 21, 22.

LFRE, unaware of Bass's directive, repeatedly requested for the staff level meeting to be rescheduled to no avail. PSOF 24, 28, 32, 33. LFRE's attempts to explain its plan were stymied by the Defendants, who gave LFRE only limited speaking opportunities at public meetings and treated them "with hostility." PSOF 31, 33. During the February 20 Board meeting, Sieman and Zima conveyed that they had investors lined up and a full project plan ready to share with the Village if only the Village would meet with them. PSOF 24, 25. At the close of the March 6 Board meeting, Trustee Cope said "if this group actually has a plan . . . let them tell the Village. Let them set up an appointment." PSOF 28. But Bass was taking steps in the shadows to ensure such meetings never happened.

LFRE clearly had a plan satisfying the Village Code's requirement for a "written description of the proposed planned unit development, describing the purpose of the development

8

and proposed land uses." *See* 8.06(1)(e). By attempting to schedule meetings and solicit feedback, LFRE was merely following the Village's direction that LFRE should engage in workshops as part of the preapplication process. Defendants now claim that LFRE's following their direction is evidence that LFRE was unprepared, but the evidence shows that Defendants stonewalled Plaintiff's efforts to access the procedures that the Code provides as a matter of right.

      **C.**      **Plaintiff and Tucker are Similarly Situated.**

The class-of-one equal protection theory bars the government from intentionally treating similarly situated citizens differently when there is no rational basis for the difference in treatment. *Cannici v. Vill. of Melrose Park*, 885 F.3d 476, 480 (7th Cir. 2018). "The classic class-of-one claim is illustrated when a public official, 'with no conceivable basis for his action other than spite or some other improper motive[,] comes down hard on a hapless private citizen.'" *Swanson v. City of Chetek*, 719 F.3d 780, 784 (7th Cir. 2013) (quoting *Lauth v. McCollum*, 424 F.3d 631, 633 (7th Cir. 2005)); *see also Vill. of Willowbrook v. Olech*, 528 U.S. 562, 563-65 (2000) (class-of-one plaintiff sufficiently alleged class of one claim where the defendant for no apparent reason demanded far more from her than "similarly situated property owners").

The Seventh Circuit has recognized that if animus is readily obvious, as it is in Bass's actions, it would be redundant to "require that the plaintiff show disparate treatment in a near exact, one-to-one comparison to another individual." *See Swanson,* 719 F.3d at 784-85. There is no precise formula for what constitutes a "similarly situated" individual, and, generally, "whether individuals are similarly situated is a factual question for the jury." *McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1002 (7th Cir. 2004); *see also Andrews*, 11 F.4th at 474 ("When evaluating whether parties are similarly situated, courts should not demand exact correlation, but should instead seek relevant similarity.") (internal quotations omitted). The record supports that a jury could find

9

Tucker was directly comparable to LFRE in all "material respects." *See Reget v. City of La Crosse*, 595 F.3d 691, 695 (7th Cir. 2010).

LFRE and Tucker were similarly situated in that they both (1) were entitled under the Code to access the pre-application process; (2) had a purchase agreement with Romspen (PSOF 13, 36); and (3) sought to access the zoning application process (PSOF 12, 15, 18, 36-37, 39). Yet, LFRE and Tucker were treated drastically differently by Defendants without any rational basis. In fact, Tucker was freely granted audiences with the Village immediately after becoming contract purchaser and then within a month the Village provided him with a timeline and step-by-step guide to the process, even though he had no plans and no financing in place. PSOF 36-39. He was far less prepared that LFRE had been. PSOF 36-39.

Defendants' emphasis on a supposed "smoking gun admission" by Sieman that neither he nor Zima were real estate developers misstates the record. Dkt. 96 at 11. Sieman made clear that although he himself is not a master developer, he and Zima *together* formed a master developer. PSOF 1-4; Resp. to DSOF 35. Sieman and Zima's combined credentials and backgrounds in real estate development are substantial and compare directly to Tucker's. PSOF 2-4. LFRE had the financial wherewithal and the technical skill to deliver this project, and Sieman never suggested otherwise.

Although Sieman is especially expert in finance, he holds a master's degree in *real estate development* from Columbia University, is a licensed real estate broker, and has participated in over 50 development projects totaling 6.5 million-plus feet and valued at over $500,000,000. PSOF 2. Sieman's portfolio includes mixed use developments involving complex public-private relationships like the Purple Hotel site, which has afforded him years of experience as a member of successful development teams. PSOF 2, 4. Zima is an architect with over two decades'

experience in real estate development, including large mixed use projects similar in scale to the Purple Hotel site. PSOF 3; DSOF 12. As the Design Principal at Studio Gang Architects, Zima was the principal-in-charge of over a dozen development projects from initial pursuit to completion of construction. PSOF 3. LFRE delivered a ZS brochure to the Village detailing ZS's qualifications and experience and described 11 complex projects on which Sieman and Zima had worked. PSOF 4. Sieman and Zima also explained their experience during various meetings and communications with the Village. PSOF 5-6, 15, 24. Then, as now, Defendants improperly chose to ignore these facts and pursue their own agenda to select their preferred purchaser and developer.

### D. Defendants Did Not Have a Rational Basis for their Discriminatory Treatment of Plaintiff.

Defendants do not dispute that they treated LFRE and Tucker differently. Nor can they. The facts show that the Village canceled and refused to reschedule meetings with LFRE but expedited meetings with Tucker (PSOF 21, 36, 39); the Village passed the Condemnation Ordinance while LFRE was the contract purchaser and rescinded it once Tucker became the contract purchaser (PSOF 28, 37); the Village sought to enforce the Code Enforcement Resolution requiring removal of foundations and adding an additional $1 million to the project cost while LFRE was the contract purchaser, then removed that requirement for Tucker and merely required Tucker to put up fencing and signage, which was less than what LFRE offered to do (PSOF 26-27, 38, 40). Wiberg, along with other witnesses, confirmed that the Condemnation Ordinance was passed because the Village wanted to pick the developer. PSOF 29.

The only "rational basis" offered by Defendants for their actions is the same as their similarly situated argument: they believed that LFRE was not as qualified as Tucker. Dkt. 96 at 13. First, as set forth above, this is a disputed issue of fact. Second, an alleged concern regarding LFRE's qualifications does not provide a rational basis for shutting LFRE out of the opportunity

11

to participate in the first step in the Code's process, which is open to all citizens who seek to access it. The Village told LFRE that it needed to participate in workshops with staff before making its preapplication presentation and then refused to meet. PSOF 8. Bass and other Village officials admitted they had no authority to choose the developer and that the Code contained no qualifications as a prerequisite to access the process (PSOF 16), but they chose to block LFRE anyway and ultimately pick their own developer.

The Village's failure to follow its own required procedures epitomizes arbitrary and capricious conduct. *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 167 (1970) ("Even where the laws are just and equal on their face, yet, by . . . a neglect or refusal to enforce their provisions, a portion of the people are denied equal protection under them."); *see also Flower Cab Co. v. Pettite*, 658 F. Supp. 1170, 1180 (N.D. Ill. 1987). A government entity cannot have a legitimate purpose in regulating beyond the authority conferred by its enabling legislation. *See Seventh St. v. Baldwin Cty. Planning & Zoning Comm'n*, 172 F. App'x 918, 921 (11th Cir. Mar. 6, 2006). As this Court held in denying Defendants' motion to dismiss Plaintiff's equal protection claim:

> The Defendants maintain that LFRE pleads itself out of court by alleging that Bass had a 30-year relationship with Tucker Development and considered them to be a 'credible contract purchaser.' However, this does not provide a rational basis for the Defendants to subject LFRE and Tucker Development to different treatment in the zoning application process. . . ***[F]avoritism is not a rational basis to extend or withhold access to a government benefit***.

Dkt. 39 at 15-16 (emphasis added).

Further, despite Defendants' claims to the contrary, *145 Fisk, LLC v. Nicklas*, 986 F.3d 759 (7th Cir. 2021) is not "on point." Dkt. 96 at 11-12. In *Fisk*, the plaintiff developer entered into a preliminary agreement with the city to redevelop a dilapidated property. 986 F.3d at 762. The agreement imposed a number of contingencies and conditions on plaintiff before the development agreement could be finalized. *Id.* at 763. In contrast, here, Defendants can point to no preconditions

12

for LFRE to proceed with the workshops, pre-application submission, and pre-application conference. Moreover, in *Fisk*, the new village manager relied on plaintiff's own submissions and conducted due diligence to determine that plaintiff's plan was not financially viable. Here, Village Manager Wiberg was wondering why Bass was blocking LFRE's efforts. PSOF 21, 35.

### E. Bass is Individually Responsible and Immunity Does Not Apply to His Unconstitutional Actions.

Defendant Bass argues that he did not take any individual action to deny LFRE's equal protection rights and, even if he did, he is entitled to absolute or qualified immunity because his decisions were made within "the sphere of legislative activity." Dkt. 96 at 13-14. This argument is contradicted by both the facts and the law.

First, the evidence shows that Bass went out of his way to ensure LFRE did not become the purchaser and developer of the property, and to steer the project to Bass's friends and family. PSOF 12, 14, 21, 24, 26, 27, 29, 35-39. For example, after being told by LFRE that it had a Letter of Intent with Romspen, Bass scheduled a meeting with Romspen that LFRE was not allowed to attend and asked Romspen why it had not responded to an offer by another potential purchaser. PSOF 12. Bass also instructed Village staff to send information regarding the site to his brother-in-law Goldberg and keep it confidential. PSOF 14. Wiberg found this so improper that he raised it with the Village attorney. PSOF 14.

Those efforts having failed, Bass then personally directed Wiberg to cancel the Village's meeting with LFRE set for February 20, 2018, ordered that this critical meeting not be rescheduled, and made it clear to Romspen that Romspen had no option but to terminate LFRE's contract. PSOF 12, 21, 27, 34. Although overseeing the project was Wiberg's duty, Bass was acting without Wiberg's knowledge and preventing Wiberg from doing his job. PSOF 35.

At the same time that Bass personally blocked LFRE from the process, he was calling, texting, and emailing with Richard Tucker—all while LFRE was still the contract purchaser. Resp. to DSOF 34. Bass rolled out the red carpet for Tucker, inviting him to present at the Village Board meeting within days of his signing of the purchase contract and cooperating fully with Tucker's request that the Village rescind the Condemnation Ordinance and stay the Code Enforcement Resolution (whereas he refused to engage with LFRE's identical requests). PSOF 36-39; Resp. to DSOF 36. Bass's actions show a deliberate disregard for LFRE's rights and the potential harm that his conduct would cause, particularly in light of the fact that Bass knew LFRE's earnest money became non-refundable on February 14, 2018 (PSOF 13). Indeed, Bass even publicly bragged that "I have worked hard to secure a good, solid, responsible developer…." PSOF 39.

Second, cloaking Bass's unconstitutional conduct as "legislative activity" does not afford immunity here. To determine whether qualified immunity applies, the Court must consider: (1) whether the facts, taken in the light most favorable to the plaintiff, show that the official's conduct violated a constitutional right, and (2) whether the right was clearly established. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The official must show that their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Goetz v. City of Springfield*, 699 F. Supp. 2d 1066, 1084 (C.D. Ill. 2010), quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). At all relevant times, the law has been clear that officials violate the equal protection clause when they seek to punish or demand more from one citizen than another for improper reasons or for no rational reason. *See Swanson*, 719 F.3d at 784.

Bass's unconstitutional conduct was separate from any discretionary policy decision—it was unauthorized intentional interference with LFRE's attempts to proceed with the application process, a process in which Bass did not have any right to choose who could participate. Bass's

14

conduct also directly violated the Village's own Ethics Code, which states that "[n]o public official or employee shall grant any special consideration, treatment or advantage to any person or business entity beyond that which is available to every other citizen." Ethics Code at § 1-4-5. The Ethics Code further reflects the Village's intention to keep favoritism out of governance as:

> (A) ***The proper operation of democratic government requires that public officials and employees be independent, impartial*** and responsive to the people they serve; that government ***decisions and policy be made in the proper channels*** of the governmental structure; that public office ***not be used for personal gain or to advance the interest of family, relatives or friends***; and that the public have confidence in the integrity of its government. . . .

*Id.* at § 1-4-2 (emphasis added).

Particularly in the face of an Ethics Code that forbade Bass's favoritism, a reasonable public official would find the illegality of Bass's intentional disparate treatment readily apparent.

## V. CONCLUSION

WHEREFORE, for all the reasons stated above, Plaintiff, Lake Forest Real Estate, LLC, respectfully requests that this Court deny Defendants' Motion for Summary Judgment and grant such other relief as this Court deems just and proper.

Dated: November 16, 2021

Respectfully submitted,

LAKE FOREST REAL ESTATE INVESTORS, LLC

By: /s/Melanie J. Chico
One of its attorneys

Melanie J. Chico (#6294469) (mchico@dykema.com)
Mark Silverman (#6307006) (msilverman@dykema.com)
Molly E. Thompson (#6293942) (mthompson@dykema.com)
Kevin Connor (#6320467) (kconnor@dykema.com)
Dykema Gossett PLLC
10 South Wacker Drive, Suite 2300
Chicago IL 60606
Telephone: 312-876-1700

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that I filed the foregoing PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT through the Court's CM/ECF system, which shall send notification of such filing to all counsel of record at their e-mail addresses on file with the Court.

/s/ Melanie J. Chico